13CV6007 ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

FRANKIE CANCEL,
                Plaintiff,

               -v-

NYPD Commissioner RAYMOND KELLY;
NYPD Supervisor JOHN DOE #1;
NYPD Officer JOHN DOE # 2;
NYPD Officer CHRISTOPHER CARUSO;
NYC Mayor MICHAEL BLOOMBERG;
The CITY OF NEW YORK,
                Defendants.
------------------------------------------------------------------X

**VERIFIED**
**COMPLAINT**

**Jury Trial Demanded**

FRANKIE CANCEL, appearing *pro-se*, complains of the defendants as

follows:

## PRELIMINARY STATEMENT

1. This is a Civil Rights action brought by Frankie Cancel (henceforth "Mr.

Cancel"), under 42 U.S.C. § 1983, in which he seeks to remedy and redress

violations to his rights guaranteed by:

    a). the First, Fourth, and Fourteenth Amendments to the United States
        Constitution ("Constitution");

    b). article I §§ 8 and 12 of the NYS Constitution, and;

    c). the NYS torts of False Arrest and Malicious Prosecution.

## JURISDICTION

2. The court has jurisdiction, over the claims advanced by Mr. Cancel,

pursuant to 28 U.S.C. §§ 1331 and 1343 as well as the aforementioned statutory and Constitutional provisions.  The amount in controversy is un-liquidated, and it is expected to exceed $100,000 (excluding interest and costs).

3.  In addition to the jurisdiction *supra*, this court has pendent/supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any state law claims.

## VENUE

4.  The venue of this action is properly laid in this district, pursuant to 28 U.S.C. § 1391 *et seq*, because:

> a). it is the judicial district where defendant City of New York is "deemed to reside" as well as where said "defendant is subject to the court's personal jurisdiction with respect to th[is] civil action…;"

> b). it is the judicial district where the Mr. Cancel appeared at Criminal court and had the charges dismissed which is a Substantial part of the events giving rise to this action, and;

> c). it is the judicial district where defendants Michael Bloomberg and Raymond Kelly is both believed to reside.

## NOTICE OF CLAIM

5.  On August 21, 2012, Mr. Cancel properly served a Notice of Claim, by "certified mail" (No.: 7011-3500-0001-2363-6583), consistent with § 50-e of the General Municipal Laws of NYS.

## JURY TRIAL DEMANDED

6.  Plaintiff Cancel demands a trial by jury on each of his claims.

## PARTIES

**Plaintiff:**

7. Plaintiff Cancel was, at all times relevant to this complaint, a resident of NYC within NYS, and a citizen of the United States of America ("US").

**Defendants:**

8. Defendant RAYMOND KELLY is the Commissioner of the NYPD, and, as such, he is the chief executive officer ("CEO") of the NYPD; in his capacity as CEO, he has the authority and responsibility to make policies, review the decisions and actions of NYPD officers, and correct customs and practices that adversely affect the constitutional rights of US citizens. He is sued in both his individual and official capacities.

9. Defendant NYPD Supervisor JOHN DOE #1 ("NYPD Supervisor"), at all times relevant hereto, is believed to have been a citizen of NYS, and a NYPD supervising officer whose badge # is believed to be 507. Defendant NYPD Supervisor is a black skinned African American Male about five feet three inches tall, and he had his hair braided in corn rows toward the back of his head. He is sued in both his individual and official capacities.

10. Defendant JOHN DOE # 2 ("Officer Doe 2"), whose name is not yet known, is a white skinned Caucasian and/or Hispanic male around five feet ten inches tall, and he was the officer that was driving the NYPD Supervisor around in

the white Ford van license plate: FSE 4607 or 4608 (**See, Exhibit 1**). His hair was combed back, as a push back, and his badge # is believed to be 2505. Officer Doe 2 was, at all times relevant here to, a citizen of NYS, and he was a police officer, within the NYPD, that was involved in the events mentioned *infra*. He is sued in both his individual and official capacities.

11. Defendant NYPD Officer CHRISTOPHER CARUSO was, at all times relevant hereto, a citizen of NYS, and a police officer with in the NYPD and employed by the other defendants in this case. He is sued in both his individual and official capacities.

12. Defendant MICHAEL BLOOMBERG is the Mayor of NYC, and the chief policy making official for the City and its various departments that includes DSS. He is sued in both his individual and official capacity.

13. Defendant CITY OF NEW YORK ("NYC") is duly incorporated under the laws of the State of New York.

14. At all times material to this Complaint, all of the above mentioned defendants are believed to have acted under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of NYS and NYC (that includes the NYPD).

## FACTUAL ALLEGATIONS

### NYPD Custom and Practice of Illegal Quotas:

15. The NYPD has a custom and practice involving a mandatory quota system ("quota system") which requires Police Officers/Supervisors to make a certain number of arrests, issue a certain number of summonses, and conduct a certain number of stop frisks, the majority without probable cause or any legitimate legal basis, in order to satisfy their pre-established monthly quotas.

16. The Officers/Supervisors that meet their quotas are rewarded and provided with incentives; on the other hand, the Officers/Supervisors that fail to meet their set number of arrests, summons, and stop frisks are penalized and punished.

17. As a result of the above mentioned quota system, the constitutional rights of US citizens, such as Mr. Cancel in this case, are repeatedly violated by NYPD Officers/Supervisors that engage in unjustified stops, arrests, and issue summonses, without probable cause, in order to meet their mandatory quotas.

18. The existence of this quota system was, originally, exposed through a series of audio recordings ("the recordings") made by, Adrian Schoolcraft,[1] a police officer that was working out of the 81st NYPD Precinct, in Brooklyn New York, which happens to be the same precinct where this plaintiff was arrested; specifically, Officer Schoolcraft recorded his then supervisors, over an extended

---

[1] "Officer Schoolcraft," subsequently, commenced an action in this court titled, Schoolcraft v. The City of New York, 10-civ.-6005 (SDNY, 2010), and this court is asked to take judicial notice of that case in terms of quota system employed by the defendants in this case.

period of time, demanding that subordinate officers meet their quota number of

arrests, summons, and frisk stops.

19. In 2010, the recordings became the subject of a series of articles that

were printed by <u>The Village Voice</u> Newspaper which highlighted the quota system

and the mountain of evidence that Officer Schoolcraft had accumulated.

20. According to the first article in the series, written by Graham Rayman[2]:

> Command often set[s] up special summons duty to artificially increase
> the numbers of tickets issued. On December 13, 2008, there was this
> from a Sergeant E.: "In order to increase the amount of C summonses
> patrol is writing, they are going to try to, when they can, put out a
> quality-of-life auto. Your goal is to write C summonses, all right?" A
> "C summons" requires a warrant check and covers a wide range of
> offenses, like public drinking, disorderly conduct, littering, blocking
> the sidewalk, and graffiti. An "A summons" is for illegal parking, and
> a "B summons" is for traffic violations like running a red light or
> using a cell phone while driving.

21. In the same article, <u>supra</u>, Rayman goes on to note that:

> [t]he pressure is the worst at the end of the month and at the end of
> every quarter, because that's when the precinct has to file activity
> reports on each officer with the borough command and police
> headquarters. (Put another way: If you want to avoid getting a ticket,
> stay away from police officers during the last few days of the month,
> when the pressure for numbers is the highest.

**Custom and Practice is Pervasive and Widespread:**

22. It is publically evident, through consistent media reports and

Litigation that the quota system is widespread and pervasive in that it is scattered

---

[2] Rayman, Graham. "The NYPD Tapes: Inside Bed-Stuy's 81st Precinct." <u>The Village Voice</u> 04
May 2010.

and spread through out the five boroughs of NYC patrolled by the NYPD.

23.  First, the borough of Brooklyn, noted in ¶'s 14-18, *supra*, is where the

81st NYPD precinct is located which is the precinct where the custom and practice

was highlighted through the recordings of Officer Schoolcraft.

24.  Second, in the borough of the Bronx, another police officer named Craig

Matthews, which worked out of the 42nd NYPD Precinct, filed a complaint[3] in this

court which also involved the NYPD quota system, *supra*.

25.  Third, in the borough of Manhattan, a police officer Rajinder Singh,

which worked out of the 20th Precinct, reportedly claimed that:

> his troubles began when Platoon Commander Steven Chantel
> informed him and his partner on Jan. 11, 2011; they'd no longer be
> working together "because they did not have a sufficient number of C-
> summonses and UF-250s on their December 2010 monthly activity
> reports." C-summonses are for quality-of-life offenses, while UF-250s
> are produced after stop-and-frisks.[4]

26.  Fourth, in the borough of Queens, as noted by John Marzulli, "[a]

Former NYPD narcotics detective [Stephen Anderson] snared in a corruption

scandal testified it was common practice to fabricate drug charges against innocent

---

[3] The complaint in question is part of another action in this court titled, <u>Matthews v. The City of New York</u>, 12-civ.-1354 (SDNY, 2012), which the Second Circuit remanded to back to this court after an appeal; this court is, additionally, asked to take judicial notice of this second case in terms of the quota system employed by the defendants in this case.

[4] Seifman, David. "Cop in 'quota' fight." <u>New York Post</u> 26 January 2012.

people to meet arrest quotas."[5]

27.   Fifth, in the borough of Staten Island the illegal quota system was

Solidified when the "controversial NYPD deputy chief who is a central figure in a

lawsuit filed by a whistleblower cop [Officer Schoolcraft, *supra*, was]...transferred

to a second-in-command position on Staten Island."[6]

28.   It is not surprising that after the central figure in the Schoolcraft case

(See, ¶ 27 *supra*) assumed the second-in-command position on Staten Island, that:

> Police on Staten Island's North Shore are steadily making more arrests
> and issuing more summonses as a result of the NYPD's controversial
> stop-and-frisk tactics, according to an analysis of the department's
> data.  Roughly 19 percent of the 120th Precinct's 12,736 street stops in
> 2011 ended in either an arrest or a summons issued last year. That
> percentage ranks higher than the city as a whole, which saw about 12
> percent of its more than 684,000 street stops end in arrest or
> summons.[7]

29.   The quota system has resulted in the repeated violation s to the

constitutional rights of citizens, as Mr. Cancel, for which it is clear that this is not

an isolated incident as evidenced by the bunch of lawsuits filed by others that had

---

[5] Marzulli, John. "We fabricated drug charges against innocent people t meet arrest quotas,
former detective testifies." NY Daily News 13 October 2011.

[6] Annese, John M. "Controversial deputy chief gets NYPD transfer to Island". Staten Island
Advance 31 December 2010.

[7] Annese, John M. "NYPD's stop-and-frisk tactics on Staten Island yield flood of arrests." Staten Island Advance 03
May 2012.

their rights violated by Officers/Supervisors determined to meet their quotas.[8]

**Defendants Kelly, Bloomberg, and City:**

30.  Defendants Kelly, Bloomberg, and City are all aware of the custom and practice, mentioned in ¶'s 15-29, *supra*, for it was brought to their attention through the series of articles printed by The Village Voice, *supra* as well as other News agencies; in fact, those three defendants became aware of the custom and practice through the claims advanced by Officer Schoolcraft, the claims advanced by other members of the NYPD, and the claims advanced by several other litigants that came forward after NYPD members mishandled similar situations in the past.

31.  After learning of the claims advanced by Officer Schoolcraft, defendant "Kelly ordered an investigation into Schoolcraft's claims. By June 2010, that investigation produced a report that... [defendant Kelly and the NYPD] tried to keep secret for nearly two years."[9]

---

[8] For example, in the case of Stinson, et al. v. City of New York, et al, 10 Civ. 4228 (SDNY, 2010), several plaintiffs brought suit claiming that their constitutional rights were violated under the quota system.

[9] Rayman, Graham.  "The NYPD Tapes Confirmed the report police hid for nearly two years that corroborates a Voice investigation — and vindicates a whistle-blower the NYPD tried to destroy." The Village Voice 07 March 2012.

32. Defendants City and Kelly, additionally, learned of the custom and practice *supra,* after being named and served as defendants in the <u>Matthews</u> and <u>Stinson</u> lawsuits, *supra.*

33. Defendants Kelly, Bloomberg, and City, knew or should have known to a moral certainty that NYPD Officers/Supervisors, as those mentioned in this case, would have to confront particular situations in which they would find themselves eager, at the end of the month, to make their pre-established quotas; thus, they would be forced to engage in unjustified stops, arrests, and issue summonses, without probable cause, in order to meet their mandatory quotas and avoid being penalized.

34. Defendants Kelly, Bloomberg, and City further knew that, as mentioned in ¶'s 15-33 *supra*, that there is a history of NYPD Officers/Supervisors mishandling those situations by violating the constitutional rights of citizens, as Plaintiff Cancel, through unjustified stops, arrests, and the issuance of summonses all without probable cause; thus, those NYPD Officers/Supervisors would be presented with difficult choices of the sort that training or supervision will make less difficult.

35. Defendants Kelly, Bloomberg, and City were, additionally, aware that the wrong choice by those NYPD Officers/Supervisors would, as noted in several

other claims and cases presented to them, continue to frequently cause violations to the constitutional rights of citizens such as Plaintiff Cancel in this case.

36. On October 17, 2011, Defendant Kelly, after trying to cover up the existence of the quota system (see ¶ 31 *supra*), displayed deliberate indifference by issuing Operations Order number 52 stating that "[d]epartment managers can and must set performance goals…" without regard to the fact that quotas or, in his words, "performance goals" has resulted in the repeated violation of constitutional rights.

37. Thus, defendants Kelly, Bloomberg, and City have all demonstrated deliberate indifference by: a) failing to take the corrective action needed to prevent the foreseeable violations of constitutional rights; b) refusing to take the steps, such as training and supervision, needed to correct and avoid the above, after repeatedly learning about it; and, c) flat out encouraging NYPD Officers/Supervisors to engage in unjustified stops, arrests, and issue summonses, without probable cause.

38. Indeed, unlike the manufacturing sector, where "performance goals" or quotas could increase productivity, in policing there is no way to guarantee that any set number of offenses will take place on any given month.  Therefore, to require NYPD Officers/Supervisors to make a certain number of arrests, issue a certain number of summonses, and conduct a certain number of stop frisks, without

there being a guarantee that the set number of offenses will take place on any given month, defendants Kelly, Bloomberg, and City have all created the environment that causes the repeated violation of Constitutional rights by defendant NYPD Officers/Supervisors eager to meet their quotas in order to avoid being penalized.

39.   Defendants Kelly, Bloomberg, and City have failed to train and supervise NYPD Officers/Supervisors on the manner that they can meet their set quotas/performance goals, on those months when there are not enough offenses committed, with out resorting to unjustified stops, arrests, and the issuance of summonses that lack probable cause .

40.   Those NYPD Officers/Supervisors are, therefore, placed in the difficult situation of having to violate the Constitutional rights of citizens, through arrests, summonses, and stop frisks that lack probable cause or any legitimate legal basis, in order to satisfy their pre-established monthly quotas.

## Violation of the Constitutional and Statutory Rights of Mr. Cancel:

42.   On May 26, 2012, as the month was nearing its end, defendants NYPD Supervisor, Doe 2, and CARUSO were all part of a special summons duty established by the Command of the Brooklyn North patrol[10] ("Brooklyn North")

---

[10]  The Brooklyn North patrol encompasses the 81st, 75th, and several other NYPD precincts.

which was set up with the intention of artificially increasing the numbers of arrests and summons issued in order to allow the named defendants in this case to meet their monthly quotas consistent with the NYPD custom mentioned in ¶'s 15-40 *supra*.

43. Defendant Doe 2 was the designated driver of the quality-of-life auto ("the auto") that was being used for the special summons duty which was a white ford van with the New York license plate number believed to be FSE 4608 (**See, Exhibit 1**); defendant NYPD Supervisor was sitting in the passenger seat of the auto as he was responsible for supervising the special summons duty.

44. At approximately 2:30 am plaintiff Cancel was inside a private business, located on 1186-88 Broadway Avenue, within the jurisdiction of the 81st NYPD Brooklyn precinct, and he was in the process of consuming a beverage that he purchased as he waited for the cashier to return his monetary change.

45. Defendants NYPD Supervisor, Doe 2, and CARUSO along with about a dozen other members of the Brooklyn North patrol of the stormed the private business as if they were a terrorist hit squad (collectively "squad") coming to terrorize Americans.

46. Plaintiff observed that, as the members of the squad entered the business, they were receiving directives and instructions from defendant NYPD Supervisor (¶ 9 *supra*), and said defendant NYPD Supervisor along with the other

officers were concealing their police badges and any other identifying material; except, that a few of them wore flak jackets that had Police written on them.

47. Defendants Caruso, Doe 2, and an unidentified police officer approached plaintiff Cancel, as the rest of the squad began to spread through out the various parts of the business where they approached and began to harass other patrons as well as employees of the business.

48. Plaintiff Cancel was told to leave the business for which he tried to reason with defendants Caruso, Doe 2, and an unidentified police officer by explaining that he was waiting on the cashier to return his change; thus, plaintiff Cancel asked if he could finish consuming the beverage that he purchased as he waited for his change before leaving.

49. Defendants Caruso and Doe 2 turned to the defendant NYPD Supervisor for guidance after which defendant NYPD Supervisor ordered plaintiff Cancel cuffed and taken outside; defendants, indeed, intended to confine plaintiff Cancel in order to meet their monthly quotas, *supra*, and they clearly had an improper motive as evidenced by the fact that there was no probable cause or legal justification to arrest him.

50. Defendants Caruso, Doe 2, and an unidentified police officer ordered plaintiff cancel to place his hands behind his back, and they proceeded to place handcuffs on plaintiff Cancel as the surveillance cameras in the business recorded

the complete situation.

51.  Plaintiff Cancel, conscious of his confinement, began to verbally object to the fact that he was being arrested "for no reason and in violation of my constitutional rights." Additionally, plaintiff Cancel began to complain about the handcuffs being placed excessively tight to the point that he was in severe pain and could not feel his hands.

52.  Defendants Caruso, Doe 2, and the unidentified police officer ignored the complaints and objections of plaintiff Cancel regarding his severe pain and improper arrest; instead, the unidentified police officer asked defendant NYPD Supervisor if plaintiff Cancel should be placed in one of the patrol cars waiting outside, but defendant NYPD Supervisor ordered that plaintiff Cancel be instead placed in the White Ford van ("the van") that was being used as the Auto (see, **Exhibit 1**).

53.  Plaintiff Cancel was placed in the back of the van with is hands painfully cuffed behind his back, and, as he was being led out of the business, plaintiff Cancel noticed that the patrol cars outside were from several precincts that included the 81st police precinct and the 75th precinct.

54.  Defendant Doe 2 got into the driver's seat of the van, and defendant NYPD Supervisor got into the passenger seat of the van; thereafter, defendant Doe 2 drove off with plaintiff Cancel in the back of the van.

55. Defendants Doe 2 and NYPD Supervisor proceeded to drive through several neighborhoods, within the Brooklyn North Patrol, and they were meeting up with other officers, throughout those areas, in order to pick up other people that were falsely arrested.

56. Plaintiff Cancel proceeded to complain and express, to defendants Doe 2 and NYPD Supervisor, that he was experiencing severe pain on his writs to the point that he felt the handcuffs cutting and swelling his writs, his circulation being stopped, which resulted in permanent nerve damage and the loss of sensitivity in his hands; defendants Doe 2 and NYPD Supervisor, however, continued to drive plaintiff around with his hands cuffed tightly being his back for hours.

57. Plaintiff Cancel, after several hours of being driven around, attempted to reason with defendants Doe 2 and NYPD Supervisor, by saying that "I have to go to the bathroom and my rights are being violated because I did not do anything wrong.  If you are going to arrest me, then take me to the precinct, or let me go, but I do not want to stay in this van handcuffed in pain!"

58. Defendant NYPD Supervisor turned his head around, to face plaintiff Cancel, and stated: "You are still in here because you have a big mouth."  Plaintiff Cancel responded that he had a first amendment right to freedom of speech, and he had a right to verbally protest the fact that he was arrested for no reason.

59. Defendant Doe 2 looked at plaintiff Cancel, through the van mirror, and

stated you were arrested for "disorderly conduct," and we will take you to the precinct after we pick up a few more people.

60.  Plaintiff Cancel was forced to suffer several hours of severe pain caused by being savagely handcuffed (¶ 56 *supra*), humiliation, and, *inter-alia*, the embarrassment of being paraded around Brooklyn Streets only because he chose to exercise his freedom of speech rights to protest his false arrest.

61.  Plaintiff Cancel noticed that defendants Doe 2 and NYPD Supervisor made several stops which included one on Stanley Street in East New York Brooklyn, by a housing project, where defendants Doe 2 and Supervisor picked up several other arrestees that were complaining of being arrested for no reason.

62.  Indeed, all of those arrested were African Americans or Hispanics, and several females were arrested for walking the streets cladly dressed, after hours, for which hey were accused of being prostitutes.

63. Plaintiff Cancel, after close to five hours, was taken to the 75th Precinct (**See, Exhibit 2**), outside the geographical area of his arrest, and, along with the van full of arrestees, was ushered out of the van, into the precinct.

## Confinement at the 75th Precinct:

64.  Plaintiff Cancel, still painfully handcuffed with his hands behind his back, along with the other arrestees, was made to stand in front of an elevated platform, in the lobby of the precinct, where the precinct commanding officer

("CO') asked defendant NYPD supervisor about each arrestee.

65. Defendant NYPD supervisor looked at plaintiff Cancel and told the CO

that "this one with the biggest mouth is probably the one that we have to let go."

66. Plaintiff Cancel was placed inside of a holding cell; he was searched;

and he was made to remove the strings from his shoes as well as his belt. Plaintiff

Cancel waited in the holding cell to be processed as he heard other arrestees

continue to complain about being falsely arrested.

67. Defendants NYPD Supervisor, Doe 2, and CARUSO charged Mr.

Cancel with violating NYS Penal Law § 240.20 (**Exhibit 2**) which states that:

> A person is guilty of disorderly conduct when, with intent to cause
> public inconvenience, annoyance or alarm, or recklessly creating a
> risk thereof:
> 1. He engages in fighting or in violent, tumultuous or threatening
> behavior; or
> 2. He makes unreasonable noise; or
> 3. In a public place, he uses abusive or obscene language, or makes
> an obscene gesture; or
> 4. Without lawful authority, he disturbs any lawful assembly or
> meeting of persons; or
> 5. He obstructs vehicular or pedestrian traffic; or
> 6. He congregates with other persons in a public place and refuses
> to comply with a lawful order of the police to disperse; or
> 7. He creates a hazardous or physically offensive condition by any act
> which serves no legitimate purpose.
> Disorderly conduct is a violation.

68. It, therefore, became apparent that plaintiff Cancel was falsely arrested

and maliciously prosecuted, by defendants, with the improper motives of meeting

their arrest quotas *supra* and punishing him [i.e., Plaintiff Cancel] for exercising

his freedom of speech as evident from, *inter-alia*, the following:

    a). there was no probable cause or legal basis to arrest plaintiff Cancel;
    b). defendants admitted that they were holding him due to his "big mouth;"
    c). and, *inter alia,* the fact that he was taken to the 75th Precinct as opposed
    to the 81st precinct where the arrest and alleged incident took place.

69.  Mr. Cancel was eventually released from the precinct, after being

charged with the disorderly conduct, as mentioned in ¶ 67 supra, and he was given

a date to appear, in August 2012, before the New York City Criminal Court located

at  346 Broadway in lower Manhattan, near **City** Hall.

70.  Defendants NYPD Supervisor, Doe 2, and CARUSO initiated a

prosecution against plaintiff, without probable cause to believe the proceeding can

succeed, which was done by completing all of the documentation needed to

prosecute this writer as well as forwarding those documents to the Criminal Courts.

71.  Mr. Cancel was embarrassed and humiliated to learn that his arrest and

charges were made public, through the Web Crims of the New York Criminal

Courts, for which he observed the false arrest charges through the internet.

## Criminal Court Appearance:

72.  Mr. Cancel appeared in the Criminal Court on the date and time

specified during which the matter terminated in his favor, without request by him

or arrangement with him, due to the lack of probable cause.

73.  Mr. Cancel requested documentation for the dismissal for which the

clerk of the court scribbled "DISMD" on the Summons (see, **Exhibit 2).**

74. Mr. Cancel has loss all sensitivity in his hands, as a result of the hand cuffing, as mentioned above, and he briefly began counseling and therapy incurring financial expenses; additionally, Mr. Cancel has been left with, among other things, a permanent scar.

## CAUSES OF ACTION

75. Plaintiff Cancel repeats and re-alleges all paragraphs of this Verified Complaint as if fully alleged herein.

76. The actions of defendants, mentioned above, were in complete contravention to the U.S. and NYS Constitutional rights of the plaintiff, mentioned in ¶ 1 *supra*, which includes but is not limited to the following:

A.  Freedom of Speech:
B.  False Arrest:
C.  Malicious Prosecution:
D.  Unreasonable excessive use of force:

**New York State and New York City Laws:**

77. Plaintiff repeats and re-alleges all paragraphs of this complaint as if fully alleged herein.

78. The actions of defendants, mentioned above, were in complete contravention to the New York State and New York City laws mentioned in ¶ 1 *supra.*

## PRAYER FOR RELIEF

WHEREFORE, Mr. Cancel requests the following relief:

A. A declaratory judgment stating that:

1). Defendants' actions, described throughout this complaint violated the rights of Mr. Cancel as set forth in ¶ 1 *supra*;

B. Issue an Injunction ordering Defendant City and Bloomberg to develop the office of an independent Inspector General that will oversee that the NYPD operates within the boundaries of the United States and New York State Constitutions.

C. Award Compensatory damages in the amount of $1,000,000 (One Million Dollars), jointly and severally, against defendants;

D. Award punitive damages in the amount of $1,000,000 (One Million Dollars), against each defendant;

E. AwardAttorney Fees, and Costs;

F. Award pre-judgment compounded interest of all the monetary awards.

G. Grant such other and further relief as to which plaintiff would be entitled.

## VERIFICATION

FRANKIE CANCEL declares under the penalty of perjury that all the facts stated throughout this complaint are true, to the best of my knowledge, and that I believe it all to be true.

Dated: 08/19/2012

Respectfully,

Frankie Cancel, Plaintiff-*Pro se*
P.O. Box 7375, JAF station
New York, New York 10116
E: frankiecancel@ymail.com




AA-600.2 (1/06)          CRIMINAL COURT – CITY OF NEW YORK

Failure to comply with these instructions may result in the issuance of a warrant for your arrest.

## TO PLEAD GUILTY

YOU MUST PERSONALLY APPEAR AT
THE COURT AND LOCATION SPECIFIED
ON THE FACE OF THIS SUMMONS.

## TO PLEAD NOT GUILTY

**By Mail:**
Within 48 hours after receipt of this summons complete the PLEA FORM below
and mail that summons to the NOT GUILTY UNIT at the Court and location
specified on the face of this summons. The Court will then notify you by mail of the
date to appear for trial. If you do not hear from the Court within 30 days after the
return date, APPEAR IN PERSON.

**In Person:**
Appear in person or by counsel on the date and time set for appearance at the
Court and location specified on the face of this Summons. A second court
appearance will then be required at a later date for trial.

## UPON APPEARING FOR ARRAIGNMENT – YOU HAVE THE RIGHT:

To be your own counsel at your arraignment and at any subsequent stage of this action.

To an adjournment to allow you to retain a lawyer of your own choosing.

To have counsel assigned by the Court if you are financially unable to obtain counsel without unreasonable hardship and charged with a traffic infraction.

To use supporting deposition as provided for in Section 100.25 of the Criminal Procedure Law. Consult the attorney at your appearance and you will be fully informed.

## IF TRAFFIC OFFENSE OTHER THAN PARKING OR JAYWALKING IS CHARGED:

A plea of guilty to this charge is equivalent to a conviction after trial.
If you are convicted, not only will you be liable to a penalty, but in addition your license to drive a motor vehicle or motorcycle and your privilege of registration, if any, are subject to suspension and revocation as prescribed by law.

**DO NOT DETACH, SUBMIT ENTIRE SUMMONS.**

### PLEA FORM

**I hereby plead not guilty**

NAME (Print) _____

ADDRESS _____

CITY _____ STATE _____ ZIP CODE _____

SIGNATURE _____ DATE _____

---

AA-600.2 (1/06)                    SUMMONS

433505087-2

The People of The State of New York vs.

Susp/Rev. Check ☐ Yes ☐ No ☐
Motorist Exhibited License ☐ Yes ☐ No ☐

Last Name _____ First Name _____ M.I. _____

Street Address _____ Apt. No. _____

City _____ State _____ Zip Code _____

Date of Birth ___ ___ ___   Sex _____

ID Number _____

OPERATOR AND/OR OWNER OF VEHICLE BEARING LICENSE

Lic. State _____ Lic. Class or ID Type _____   Date Expires ___ ___ ___

Plate _____   State _____   Reg. Expires   Orange Owns Vehicle ☐ Yes ☐ No ☐

VIN No. _____   Alter/Fake Plate _____   State _____

THE PERSON DESCRIBED ABOVE IS CHARGED AS FOLLOWS:

AM ☐   Time _____   County/ _____   Precinct _____
PM ☐   Date of Offense _____

Place of Occurrence _____

IN VIOLATION OF:

Sec. _____   Sub. _____

Description of Criminal Court Offense (Including Traffic Misdemeanor) _____

SPEEDING _____   Bicycle/V   Traf/ Court /GOV   Unihazac/   Unreg/   Bus   Unlic/
MPH _____   In Hit-Fix Area   ☐ Sign.   Plate   ☐ Unmarsd   Comr./   Haz/   Other/
                                          Signal   Marks   Veh.   Veh.   Haz. Mat.

The person described above is summoned to appear at CRIMINAL COURT _____ Summons Part   County _____

Located at _____

on the _____ day of _____ , _____   at _____ a.m./p.m.

I personally observed the commission of the offense charged above/False statements made herein
are punishable as a Class A Misdemeanor pursuant to Section 210.45 of the Penal Law. Affirmed
under penalty of perjury.

Rank/Full Signature of Complainant _____

Complainant's Full Name (printed) _____   Command Code _____

Agency/NCIC _____   Squad _____   Tax Registry No. _____

I acknowledge receipt of this summons. I understand it is my responsibility to read and comply
with the instructions on my copy, and that my signature below is not an admission of guilt.

Name _____   Date _____

                                        CRIMINAL COURT